535 A.2d 214

Gazebo, Inc., and Vincent A. Crisanti *v.* Zoning Board of Adjustment of the City of Pittsburgh and Alan Guttman. Alan Guttman, Appellant.

Gazebo, Inc., and Vincent A. Crisanti *v.* Zoning Board of Adjustment of the City of Pittsburgh and Alan Guttman. City of Pittsburgh, Appellant.

Argued October 5, 1987, before Judges CRAIG, DOYLE and BARRY, sitting as a panel of three.

38

*Mark D. Shephard, Buchanan Ingersoll Professional Corporation,* for appellant, Alan Guttman.

*Kellen McClendon,* Assistant City Solicitor, with him, *D. R. Pellegrini,* City Solicitor, for appellant, City of Pittsburgh.

*William R. Grove, Jr., Hollinshead and Mendelson,* for appellees, Gazebo, Inc., and Vincent A. Crisanti.

OPINION BY JUDGE CRAIG, December 16, 1987:

This zoning appeal involves consideration of the principles which govern the modification or removal of conditions incorporated in a zoning board's previous issuance of a special exception approval.

Specifically, where an unappealed zoning board decision has previously imposed limiting conditions upon its approval of a special exception request, expressly recognizing that actual experience for a season may be pertinent to subsequent review of the conditions, does

the landowner applicant, to obtain modification of the conditions, have the burden of showing a subsequent substantial change of factual circumstances incident to the property, or do the objectors, to resist such modification, again have the burden of proving detriment to the health, safety or welfare, as was applicable to the original opposition of the special exception grant?

The applicant's burden, stated in the foregoing, is drawn from this court's decision in *Amoco Oil Co. v. Zoning Hearing Board of Middletown Township,* 76 Pa. Commonwealth Ct. 35, 463 A.2d 103 (1983), and the objector's burden is that expressed in *Bray v. Zoning Board of Adjustment,* 48 Pa. Commonwealth Ct. 523, 410 A.2d 909 (1980), and other cases.

### *History*

The record pertinent to this case necessarily embraces two decisions of the Pittsburgh Zoning Board of Adjustment relating to the application of Gazebo, Inc. to operate a roof-deck serving area above the Gazebo's existing one-story restaurant and delicatessen on Walnut Street in the Shadyside district of Pittsburgh.

The board's decision of June 6, 1985, which approved the special exception application subject to conditions, sets forth the board's findings of facts as follows: "Findings of Fact: The subject case involves a request to continue the use of the first floor of 5440 Walnut Street as a restaurant. Additionally, the appellant is requesting permission to establish a roof-deck serving area above the existing restaurant.

The roof-deck serving area would be used on a seasonal basis, weather-permitting.

The proposed continued and new uses require no additional parking.

The subject site is zoned A-1, which is a mixed use commercial-residential zone.

This site directly abuts a densely populated residential zone across the alley which runs along the rear of the restaurant.

A bakery which serves the Gazebo restaurant and which is located on a separate zoning lot to the west will be relocated to space within the Gazebo.

Refuse, which is now stored in a container that sits in the right of way behind the site, will be relocated to a recess in the Gazebo building. This will serve the subject property and an abutting property.

The Gazebo will continue to share a liquor license with the abutting establishment, which is known as Humphrey's. Humphrey's is serviced by the Gazebo kitchen.

Each property is on a separate zoning lot and has been issued a separate Certificate of Occupancy.

The roof-deck will be fully enclosed and planter boxes and shrubbery will be placed on the perimeter.

The refuse area is for dry refuse only and will have daily pick-up. A refuse disposal is being installed for food wastes.

A retractable awning and umbrella tables will be installed on the roof-deck.

Witnesses appeared in opposition and in favor of the subject application.

The opposition focused on possible congestion that would result from additional patrons being drawn to this location.

The opposition was also concerned about the noise and disturbance that could be caused by the roof-deck dining area in close proximity to the residential structures across the rear alley.

Testimony indicated that this outdoor dining area is consistent with the ambience of the up-scale retail district known as Walnut Street.

However, the Board shares the concerns of the residents regarding possible noise problems.

The board's 1985 decision thus proceeded to approve the special exception application subject to the following conditions:

1—The stairs to the roof-deck from Bellefonte Street will be used for exit only.

2—Mechanical equipment shall be enclosed on all sides and the enclosure must be approved by the zoning administrator.

3—Roof-deck dining area must be enclosed on front, rear, and western side by a solid fence and planted buffer to be approved by the zoning administrator.

4—There shall be no music, live or recorded, and no speakers for the amplification of music, in the roof-deck dining area.

5—The hours of operation of the roof-deck dining area shall be as follows:

Sunday through Thursday 11:00 a.m. — Midnight

Friday and Saturday 11:00 a.m. — 1:00 a.m.

Because neither the applicant, nor the city, nor the neighbors appealed that board decision, it became final. There was, and is, no question concerning the propriety of allowing the expanded restaurant use on the roof-deck, by way of special exception in accordance with the requirements expressly governing such a special exception in section 909.06(b)(15) of the Pittsburgh Zoning Ordinance and the express authority in section 909.06(b)(15)(A) granted to the board to impose conditions upon such special exception approval.

At the end of the 1985 decision, the board stated:

Since this is the first roof-deck dining area entertained by the Board, the issues addressed by the above conditions are not res judicata and can be reviewed by the Board after the first season on motion of the applicant.

According to the record, the roof-deck operation proceeded during the outdoor season of 1985 in accordance with the approval conditions.

In 1986, the applicant returned to the board with a request to eliminate condition 4, prohibiting music and music amplification in the roof-deck dining area, and condition 5, requiring the roof-deck operating hours to conclude earlier than 2 a.m.

The board's findings in its May 5, 1986 decision summarized the results of its hearing on that request as follows:

"A number of citizens appeared in opposition to this proposal, some of whom live close to the roof-deck.

The Board permitted substantial time for the Appellant's expert witness to discuss audiological tests he conducted at the site. He also offered a primer on the technological aspects of sound.

The opposing neighbors disputed the scientific conclusions and testified that outdoor music and very late outdoor dining would, as a matter of common sense, disturb the abutting residential zone.

The Appellants' audiological expert could not state that this activity would not cause a disruption or disturbance. He conceded that decibel levels are not the only determining factor when assessing the disturbing nature of noise."

The board ended its decision with a "Conclusion" which should fairly be characterized as a finding of fact rather than a conclusion of law:

"The Board is not satisfied that the proposed changes would not be detrimental. The Board believes that outdoor music at this location would have a detrimental effect on the abutting and adjacent properties."

The board therefore denied the applicant's request to remove or modify the two specified conditions.

From that denial, the applicant appealed to the Common Pleas Court of Allegheny County, where a

judge of that court reviewed the board's decision by considering the entire record and briefs and arguments of the parties, without receiving any new evidence. On that basis, the trial court ruled:

> [W]e find, based on the evidence presented to the Board, that the objectors have not met their burden of proof that the proposed use by the appellant will have a genuinely negative impact on the general health, safety or welfare or that it will conflict with the policy of the ordinance or the public interest. Accordingly, we find that the Zoning Board committed an abuse of discretion in failing to remove the conditions restricting the hours of operation and prohibiting any music on the roof deck.

The trial judge hence reversed the board by (1) removing the condition as to hours of operation, noting that the closing hour set by liquor control law would still pertain, and by (2) modifying the music prohibition to allow music "and speakers for the amplification of music" in the roof-deck dining area at times other than 11 p.m. to 11 a.m., but only at "such a volume as not to create a public nuisance which affects the health, safety or welfare of the neighborhood." The trial judge added that his order could be modified on the application of persons affected, if the music is or becomes a public nuisance.

### Scope of Review

At the outset, the trial court's departure from the proper scope of review is made apparent by the statement in the judge's opinion that:

> [W]e find, based on the evidence presented to the Board. . . .

Clearly the correct scope of review is that, when the trial court has received no additional evidence, the trial

court (and this court as well) is limited to determining whether the board committed an error of law or an abuse of discretion. *Lebovitz v. Zoning Board of Adjustment,* 87 Pa. Commonwealth Ct. 200, 206, 486 A.2d 1061, 1065 (1985). A key test of abuse of discretion is whether the board has proceeded on the basis of findings of fact unsupported by substantial evidence. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983); 2 Pa. C. S. §754(b).

But here the trial judge erred by substituting himself for the board and making his own finding, on the evidence presented to the board, as distinguished from considering the record to see if it contained substantial evidence to support the board's findings.

Because the standard governing this court is identical to that which governed the trial court, our review duty is to proceed to consider whether the board committed an error of law or abused its discretion by proceeding on the basis of findings unsupported by substantial evidence.

### Burdens

The burden of proof applied by the trial court is also apparent in the trial judge's words that

> the objectors have not met their burden of proof that the proposed use by the appellant will have a genuinely negative impact on the general health, safety or welfare or that it will conflict with the policy of the ordinance or the public interest.

Quite obviously, that burden is the one which must be borne by those opposing the grant of a special exception approval at the outset, to prove that the requested use would constitute a detriment to public health, safety or welfare. *Bray; Tieger Appeal,* 100 Pa. Commonwealth Ct. 100, 108, 514 A.2d 276, 279 (1986). That burden of

the objectors was germane to the 1985 proceedings, pursuant to which the board's final decision necessarily was that no evidence submitted by the objectors or otherwise was sufficient to prevent issuance of special exception approval for the use, except as such evidence warranted attachment of the conditions.

When the special exception grant is past and done, the shifting burdens applied at that juncture by our cases are no more. With respect to the nature of the application in the 1986 case here, *Amoco Oil Co.* is pertinent; there the opinion by Judge ROGERS states:

> Neither the parties nor we have found a case describing *the burden of proof resting on the applicant for the modification of a condition attached to the grant of an unappealable special exception.* However, the analogy to variances is perfect. The applicant for a variance seeks relief from the stricture of zoning regulations; the applicant for the removal of a condition on an unappealed special exception seeks relief from a definitive limitation upon the use allowed by the special exception. There is, therefore, no reason why the burden of the applicant for relief from a condition attached to an unappealed special exception should be different from that imposed upon the applicant for variance from a zoning regulation materially identical to a variance unsuccessfully sought in an earlier application.

76 Pa. Commonwealth Ct. at 37-8, 463 A.2d at 104 (emphasis added). Citing *Filanowski v. Zoning Board of Adjustment,* 439 Pa. 360, 363, 266 A.2d 670, 672 (1970), Judge ROGERS proceeded to quote the Supreme Court to the effect that res judicata is inapplicable with respect to successive applications for a variance in that variance refusal does not preclude a subsequent grant "if there has been a subsequent substantial change in conditions incident to the land itself."

The board's 1985 comment in this case was entirely consistent with the applicant's modification burden stated in *Amoco Oil.* In accord with the 1970 and 1983 approaches of the Supreme Court and this court, the board here correctly described the conditions as "not res judicata" and therefore subject to subsequent review on motion of the applicant. With irreproachable common sense, the board recognized that a season's opertion could supply ·evidence on the point which the courts have characterized as proof of subsequent substantial change in conditions—a formulation in which the word "conditions" necessarily refers to factual circumstances, as distinguished from the "conditions" imposed in the board's grant as legal limitations.

### The Board's Findings and the Record

The entire common basis of factual concern as to condition 4, relating to music, and condition 5, relating to hours of operation, is the impact of *noise* from the partially unenclosed roof-deck restaurant, as it may affect the nearby residences during the warmer months, when the roof-deck facility is open for business and the windows in residences are also normally open.

Therefore, the crucial board findings are those in which the board held that

> The Appellants audiological expert could not state that this activity would not cause a disruption or disturbance. He conceded that decibel levels are not the only determining factor when assessing the disturbing nature of noise.

> The Board is not satisfied that the proposed changes would not be detrimental. . . . Outdoor music at this location would have a detrimental effect on the abutting and adjacent properties.

As a matter of law, such findings clearly are sufficient to justify the board's refusal to modify the two conditions

affecting noise emanation. The bottom-line question, therefore, is whether there is substantial evidence in the record to support the above-quoted findings.

On both sides, the able briefs of counsel well and fairly summarize at least the evidence favorable to the respective side. The import of the testimony of the applicant's qualified audiological expert, as drawn from pp. 3-5 of the Appellees' Brief, was substantially as follows:

A zero noise level is virually nonexistent. The average range of normal conversation is 60 to 80 decibels, and the board hearing itself was being conducted at 70 decibels.

When group conversation at 70 decibels is added to a like group, the result is approximately 73 decibels. As the distance from a noise source is doubled, the noise output is reduced by 6 decibels; i.e., 80 decibels at a 1 meter distance from the source is reduced to 74 at a 2 meter distance. Two speakers do not double a noise level but only increase it by a couple of decibels. Without speaking in the board hearing room, the noise level would range from 40 to 50 decibels. In the alley between the restaurant and the residences, without music, the noise of 61 people talking on the roof-deck was 50 decibels.

Without having taken a reading when the roof-deck was closed, the expert estimated that the result probably would not be much below 50 decibels.

If the playing of music produced 50 decibels in the alley, the music would not be disturbing. Fifty decibels is an acceptable noise level for humans in an urban evironment.

From tests using 2 radios with 2 speakers the expert recommended 80 decibels of music output controlled, which, in his opinion, would not be disturbing to residents. The volume setting on the amplifier, rather than the size of the speaker, is the important factor with respect to noise. Music would be incorporated into other ambient noises.

A lay witness for the applicant walked around the roof-deck area many times at ground level, while the roof was occupied, and heard nothing but the ambient noise level.

On the other side of the ledger, the objectors' brief pointed out that the expert did not conduct any test study during the warm months when the roof-deck would operate, but only in February. He acknowledged that his tests were valid under the conditions pursuant to which they were performed, and that, under different conditions, the results would be different. He admitted that sound travels faster in summer, in warmer weather. The expert agreed that it is the intrusive nature of the sounds that would determine whether or not it is disturbing, as opposed to the decibel level. The expert stated that a three-decibel increase would be a substantial increase. The expert did not perform any tests using four speakers, the number which the applicant anticipated using.

A lay witness for the objectors testified that, during the first summer the roof-deck was open (with customers, but without music) the witness and her husband could hear clearly the conversations of the customers and consequently had to move to their front bedroom, shut the door and turn on the air conditioner in order to sleep. Other residents, for illustrations, cited disturbances caused by music coming from certain indoor restaurants in the neighborhood which featured music.

In summary, the record contains substantial evidence on both sides, with considerable conflict and contradiction between the two, which the board had to resolve.

Obviously, the applicant's noise expert relied heavily upon decibel measurements of sound volume, derived in part by wintertime tests using sound-producing equipment simulating, but not matching, the music amplification devices actually contemplated.

As stated above with respect to the allowable scope of review, neither the trial judge nor this court is allowed by law to weigh the conflicting evidence, no doubt sincerely offered from both sides. Only the zoning board had the power to resolve the conflict. Quite apparently the board's resolution of that conflict is reflected in the board's adoption of an important premise—found by the board to have been conceded by the expert: "that decibel levels are not the only determining factor when assessing the disturbing nature of noise."

In the expert's testimony, one of several passages pertinent to that premise reads as follows:

CHAIRMAN MISTICK: Doctor, would you agree that the environment in which you hear a noise has a lot to do with whether or not it's disturbing?

THE WITNESS: yes.

. . . .

CHAIRMAN MISTICK: But it's the intrusive nature of the sounds that might determine whether it's disturbing, as opposed to the decibel level.

MR. FOX [board member]: But this is very enlightening.

THE WITNESS: I agree to that.

Accordingly, the record contains substantial evidence to support the premise expressly adopted by the board and, despite contradictory lay testimony and an opposing theory from the expert, there is also substantial evidence to support the board's factual determination that a threat of detrimental disturbance continued to be present in the prospect of adding amplified music and longer hours. Hence, the evidence of the 1986 hearing, in the board's view, did not establish any substantial change from the board's 1985 determinations which supplied the basis for the conditions in question.

### Conclusion

Because the trial judge exceeded the allowable scope of review in making independent findings, and because the record contains substantial evidence to support the board's findings as a basis for maintaining the conditions, the board did not abuse its discretion and its decision should have been affirmed.

Consequently, the appealed court order is reversed.

### ORDER

Now, December 16, 1987, the order of the Court of Common Pleas of Allegheny County, dated October 30, 1986, is reversed.